IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA L. GONZALEZ, | ) | Case No. 1:18-cv-890 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.      Introduction**

Plaintiff, Maria Gonzalez, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Gonzalez's application for DIB be affirmed.

**II.      Procedural History**

On July 13, 2015, Gonzalez applied for DIB.  (Tr. 423–29).[1]  Gonzalez alleged that she became disabled on June 26, 2015, due to fibromyalgia, anxiety, and migraine headaches. (Tr. 328, 423).  The Social Security Administration denied Gonzalez's application initially and upon reconsideration (Tr. 327–60).  Gonzalez requested an administrative hearing.  (Tr. 375–76).

---

[1] The administrative transcript is in ECF Doc. 13.

Administrative Law Judge ("ALJ") Joseph Hajjar heard Gonzalez's case on February 15, 2017, and denied the claim in a May 30, 2017, decision.  (Tr. 254–71, 284–326).  On February 16, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–7).  On April 18, 2018, Gonzalez filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Gonzalez was born on August 20, 1967, and she was 47 years old on the alleged onset date.  (Tr. 423).  She was a high school graduate, and she had a technical school certificate in "medical office."  (Tr. 290).  She had past relevant work experience as a front desk receptionist, billing specialist, and office manager.  (Tr. 269, 290–93).

### B.  Relevant Medical Evidence

Between August 10, 2010, and March 28, 2017, Gonzalez regularly saw Laxman Cingireddi, MD, for general treatment of all her conditions.  (Tr. 635–38, 685–709, 714–17, 728–31, 745–94, 800–78, 1111–14, 1243–47, 1367–1404, 1676–1748, 1854–89).  With regard to Gonzalez's physical condition, Dr. Cingireddi regularly noted that Gonzalez had a normal gait, full strength in her upper and lower extremities, normal muscular development, and a normal range of motion.  (Tr. 745–74, 787, 794, 864–77, 1114, 1246, 1372, 1403, 1699, 1747, 1876, 1859).  On November 11, 2013, Gonzalez complained that she had numbness, tingling, and joint pain in her legs; however, her neurological exams were normal and Dr. Cingireddi advised her to diet and exercise. (Tr. 695, 699).  On April 2, 2014, Gonzalez complained that she had body aches and pains, but she denied any weakness, numbness, or tingling.  (Tr. 685, 690).  Dr. Cingireddi found that her shoulders, hips, and knees were tender.  (Tr. 690).  On April 15 and April 18, 2014, Gonzalez told Dr. Cingireddi that her medications controlled her fibromyalgia,

but she had numbness and tingling in her hands.  (Tr. 845, 860).  Gonzalez's hands were normal

on neurological examination.  (Tr. 850).  At eleven appointments from July 28, 2014, through

February 1, 2016, Gonzalez denied having any weakness, numbness, or pain in her muscles,

back, and joints.  (Tr. 635, 791, 801, 810, 820, 828, 837, 1111, 1243, 1400).  Nonetheless,

Gonzalez complained that she could not work due to her fibromyalgia and other conditions on

June 18, 2015, and she had pain and swelling in her ankle on August 17, 2015.  (Tr. 784, 791).

On September 23, 2015, December 3, 2015, February 1, 2016, May 17, 2016, October 31, 2016,

January 10, 2017, February 24, 2017, and March 24, 2017, Dr. Cingireddi found that Gonzalez

had an adequately aligned spine, intact range of motion in her spine and extremities, normal

muscular development, and a normal gait.  (Tr. 787, 794, 1114, 1246, 1372, 1403, 1699, 1747,

1859, 1876).  Gonzalez complained that she had some tenderness in her knee on May 3, 2016;

neck pain and scoliosis on November 29, 2016; muscle, back, and joint pain on December 27,

2016; and pain, tenderness, and decreased range of motion in her left shoulder on January 24,

2017.  (Tr. 1383, 1681, 1716, 1725).  Nevertheless, Gonzalez said that she did not want to go to

physical therapy or see a surgeon for her shoulder pain.  (Tr. 1682).  On November 29, 2016, and

March 24, 2017, Gonzalez told Dr. Cingireddi that she exercised to help control her weight;

however, she decreased her exercise "a little" due to pain.  (Tr. 1709, 1854).

With regard to mental symptoms, Dr. Cingireddi regularly noted that Gonzalez was

pleasant, and had normal mood, memory, affect, and judgment.  (Tr. 637, 708, 716, 730, 751,

757, 765, 769–73, 787, 794, 803, 813, 822, 831, 839, 849, 860, 864–73, 1114, 1246, 1403, 1682,

1731, 1747, 1876, 1859).  In July 2011, Gonzalez told Dr. Cingireddi that she had depression and

anxiety, but she refused antidepressants and psychiatric consultation.  (Tr. 767).  On October 12,

2011, Gonzalez said that her medication helped her anxiety, but she continued to refuse

counseling or psychiatric consultation.  (Tr. 761, 763).  On April 4, 2014, and April 15, 2014,

3

Gonzalez denied having any anxiety.  (Tr. 783, 861).  On June 18, 2015, Gonzalez said that her

anxiety and other conditions prevented her from working, but she again refused counseling and

psychology referrals.  (Tr. 791, 794).  On May 17, 2016, Gonzalez told Dr. Cingireddi that she

saw a psychiatrist, and that her medication helped with her depression and anxiety.  (Tr. 1368).

On January 24, 2017, and March 24, 2017, Gonzalez denied having any anxiety.  (Tr. 1683,

1860).

On August 24, 2010, Gonzalez saw Preetha Muthusamy, MD, for her dizziness and

headaches.  (Tr. 971).  On examination, Dr. Muthusamy noted that Gonzalez had normal tone

and full strength in all her extremities and neck, and she had a normal gait.  (Tr. 972).  On April

22, 2014, Gonzalez told Dr. Muthusamy that she had progressively worse body pain and

numbness/tingling in her extremities.  (Tr. 956).  She rated her pain as a 9/10.  (Tr. 956Dr.

Muthusamy diagnosed Gonzalez with fibromyalgia, and prescribed medication and physical

therapy.  (Tr. 959–60).  On June 9, 2014, Dr. Muthusamy conducted a nerve conduction study,

which did not reveal any evidence of generalized sensorimotor peripheral neuropathy.  (Tr. 913–

16).  At a follow-up on August 13, 2014, Dr. Muthusamy noted that Gonzalez stopped taking her

neuropathic medication, had swelling in her legs, and had pain in her back, wrist, and ankle.

(Tr. 632).  Upon physical examination on April 22, 2014, August 13, 2014, September 1, 2015,

September 1, 2016, Dr. Muthusamy noted that Gonzalez had normal range of motion, no muscle

or joint tenderness, and a normal gait.  (Tr. 634, 945, 958, 1362–63).  Dr. Muthusamy advised

Gonzalez to exercise and stay physically active.  (Tr. 634, 945).  On January 5, 2017,

Dr. Muthusamy noted that Gonzalez had normal range of motion and no muscle or joint

tenderness; however, her gait was wide based and ataxic.  (Tr. 1654).  On March 1, 2017,

Gonzalez told Dr. Muthusamy that she had constant pain in her feet, legs, hands, left shoulder,

back, buttocks, and hips.  (Tr. 1814).  On examination, Dr. Muthusamy noted that Gonzalez had

normal range of motion, tenderness in her neck and arms, full strength in her upper and lower extremities, and normal muscle tone.  (Tr. 1818).

On March 19, 2012, Gonzalez told Patel Bhupendra, MD, that she had pain in her right index finger.  (Tr. 882).  Dr. Bhupendra found mild narrowing in her finger joints, but did not find any evidence of soft tissue swelling, erosive changes, or arthritis.  (Tr. 882).

On June 13, 2014, Gonzalez saw Apostolos Kontzias, MD, for treatment of pain and fatigue.  (Tr. 638–39).  Gonzalez told Dr. Kontzias that she had muscle aches, and worsening pain in her left wrist and left ankle.  (Tr. 639).  On examination, Dr. Kontzias found that Gonzalez had full muscle strength, normal muscle tone, and good range of motion in her shoulders, wrists, knees, ankles, and hips.  (Tr. 640–41).  Dr. Kontzias prescribed aerobic exercise, sleep, and medication.  (Tr. 641).

From June 17, 2014, through November 12, 2014, Gonzalez went to 13 physical therapy sessions for treatment related to her fibromyalgia diagnosis.  (Tr. 561–70).  During her physical therapy sessions, Gonzalez reported pain ranging from 4/10 to 10/10, with her most common pain ratings in the 5-6/10 range.  (Tr. 561–70).  On July 2, 2014, July 14, 2014, and August 2014, Gonzalez reported that her physical therapy helped her feel better and she felt less sore after therapy sessions.  (Tr. 565–66).  On July 21, 2014, she reported that she was able to go dancing.  (Tr. 564).  At discharge from physical therapy, Charlene Jackson, PT, noted that Gonzalez had 5/10 pain in her ankles/knees, and that her wrists bothered her.  (Tr. 561).  Gonzalez also had 4/5 left hip flexion, 5/5 right hip flexion, 3+/5 left hip abduction, 4+/5 right hip abduction, 3+/5 left extension, and 5/5 right extension.  (Tr. 561).

On June 29, 2015, Gonzalez told Kaitlyn Ferguson, PA-C, that she quit her job due to "overwhelming" pain in her buttocks, legs, feet, and hands.  (Tr. 590).  Gonzalez said that her pain was worse in the morning.  (Tr. 590).  On examination, Ferguson noted that Gonzalez did

not have any weakness or balance issues, but her hands and feet were intermittently numb. (Tr. 591–93).  Gonzalez's gait was normal, and she had full strength in her upper and lower extremities.  (Tr. 593).  At a follow-up on April 19, 2016, Ferguson noted that Gonzalez's leg pain got worse in the previous month, and that she ached "after exercising a long time." (Tr. 1392).  On examination, Ferguson noted that Gonzalez had normal range of motion, no muscle or joint tenderness, full strength in her upper and lower extremities, and a normal gait. (Tr. 1395).

On August 6, 2015, Gonzalez saw Samar El Sayegh, MD, for assessment and management of her mood and anxiety.  (Tr. 667).  Dr. El Sayegh noted that Gonzalez had anxiety and depression since 2013, but that she got worse after quitting work due to pain. (Tr. 667).  On examination, Dr. El Sayegh noted that Gonzalez was nervous, organized, cooperative, and anxious.  (Tr. 669).  She had an intact orientation, memory, attention, and fund of knowledge.  (Tr. 669).  She also had adequate judgment and insight.  (Tr. 669).  Dr. El Sayegh diagnosed Gonzalez with major depressive disorder and generalized anxiety disorder.  (Tr. 670). He referred Gonzalez to therapy, but she declined.  (Tr. 670).  At follow-ups on November 17, 2015, and September 21, 2016, Dr. El Sayegh did not note any changes in Gonzalez's mental condition on examination or her receptiveness to therapy.  (Tr. 1044–45, 1050).  On February 4, 2016, Gonzalez told Dr. El Sayegh that she had panic attacks and that her anxiety was not controlled due to her fibromyalgia pain.  (Tr. 1642).  Dr. El Sayegh again did not note any significant changes on examination, and Gonzalez declined therapy.  (Tr. 1643–44).  On July 29, 2016, Gonzalez told Dr. El Sayegh that she had difficulty concentrating, was not 'very nice," did not want to be around people, had anxiety, and felt overwhelmed.  (Tr. 1635).  On examination on July 29, 2016, and December 30, 2016, Dr. El Sayegh again did not note any significant

changes in Gonzalez's mental health condition.  (Tr. 1637–38, 1794–95).  However, on July 29, 2016, Dr. El Sayegh gave Gonzalez a list of therapists.  (Tr. 1638).

On January 24, 2017, Dr. Bhupendra found mild degenerative changes in Gonzalez's shoulder.  (Tr. 1667).  On January 27, 2017, Priya Sundaram, MD, took an MRI of Gonzalez's back, which revealed degenerative changes in her cervical spine.  (Tr. 1893).

### C.  Relevant Opinion Evidence

#### 1.  Treating Source—Samar El Sayegh, M.D.

On July 29, 2015, Dr. El Sayegh completed an "assessment of ability to do work-related activities (mental)."  (Tr. 1325–27).  Dr. El Sayegh opined that Gonzalez had mild limitations in relating to other people, sustaining a routine without special supervision, responding appropriately to supervision, using good judgment, and performing simple tasks.  (Tr. 1325–26).  She had moderate limitations in performing activities within a schedule maintaining regular attendance, and being punctual; understanding, carrying out, and remembering instructions; responding appropriately to coworkers; responding to customary work pressures; responding appropriately to changes in the work setting; performing complex, repetitive, or varied tasks; behaving in an emotionally stable manner; and performing daily activities.  (Tr. 1325–26).  He also indicated that Gonzalez had marked limitations in maintaining concentration and attention for extended periods.  (Tr. 1325).

#### 2.  Consultative Examiner—Louis DeCola, Jr., Ph.D.

On September 18, 2015, Louis DeCola, Jr., Ph.D., conducted a psychological evaluation on referral from the Ohio Division of Disability Determination.  (Tr. 974–79).  Gonzalez told Dr. DeCola that, in a typical day, she got up at 6 am, cooked, did laundry, cleaned the house, did dishes, swept, swam in her pool, watched television, used the internet, and talked with friends and family on the telephone.  (Tr. 976).  She also got groceries once a week, had a driver's

license, and could manage money and pay bills.  (Tr. 976).  Gonzalez also told Dr. DeCola that

she was able to "interact[] well with everyone" when she worked as a cashier, and that she quit

her billing job due to her pain, fatigue, joint stiffness, and anxiety.  (Tr. 975–76).  Dr. DeCola

noted that Gonzalez was polite and cooperative throughout the exam, had logical and well-

organized thought processes, appeared "mild to moderately" anxious, followed the follow of

conversation adequately, and was not distracted by ambient sounds.  (Tr. 976–77).

### 3.    Physical Therapist—Jennifer Diehl, PT

On July 6, 2015, physical therapist Jennifer Diehl completed a "functional capacity

evaluation," finding that Gonzalez could perform at the sedentary level.  (Tr. 573–74).  Diehl

noted that Gonzalez's hands "fatigued the most with physical exertion, but she was able to

modify her positions to allow her to complete . . . tasks."  (Tr. 574).  Diehl based her findings, in

part, on a questionnaire, during which Gonzalez told her that she could sit for 1 to 2 hours at a

time, stand for 20 minutes, walk for 30 to 60 minutes, drive for three hours, and kneel for 10

minutes.  (Tr. 574).  Gonzalez also said that she had pain ranging from 1.5 out of 10 to 10 out of

10.  (Tr. 574).  On physical function testing, Diehl noted that: (1) Gonzalez's bilateral strength

was within normal limits; (2) she could occasionally push 43 pounds, pull 36 pounds, floor to

knuckle lift 19 pounds, knuckle to shoulder lift 17 pounds, shoulder to overhead lift 12 pounds,

bilaterally carry 19 pounds, and unilaterally carry 11 pounds; and (3) she could frequently floor

to knuckle lift 13 pounds and bilaterally carry 14 pounds.  (Tr. 575–76).  Diehl noted that

Gonzalez was pleasant and cooperative during the evaluation.  (Tr. 578).  Diehl opined, *inter*

*alia*, that Gonzalez had "physical and mental health problems that would likely reduce her ability

to respond well to co-workers and a supervisor," including mild to moderate depression and

anxiety, fair eye contact, below average energy, and a restless and tense appearance.  (Tr. 579).

8

### 4.      State Agency Consultants

On October 5, 2015, state agency consultant Lynne Torello, M.D., evaluated Gonzalez's physical abilities based upon a record review.  (Tr. 338–39, 342).  Dr. Torello opined that Gonzalez could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for up to 6 hours in an 8-hour workday, sit for up to 6 hours in an 8-hour workday, and push and/or pull without limitations.  (Tr. 338).  Based on her findings, Dr. Torello opined that Gonzalez had the RFC to perform light work.  (Tr. 342).  On December 16, 2015, William Bolz, M.D., concurred with Dr. Torello's opinion.  (Tr. 354–55, 358).

On October 9, 2015, state agency consultant Kristen Haskins, Psy.D., evaluated Gonzalez's mental abilities based on a review of the record.  (Tr. 336, 339–41).  Dr. Haskins opined that Gonzalez had mild restrictions in daily living activities, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  (Tr. 336).  Gonzalez's "moderate limitations" in social functioning, included limitations in her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 340).  Gonzalez did not have significant limitations in asking simple questions, requesting assistance, maintaining appropriate social behavior, and adhering to basic standards of neatness and cleanliness.  (Tr. 340).  Dr. Haskins stated that Gonzalez "ha[d] the ability to interact appropriately with others in the workplace that has expectation for occasional and superficial interactions."  (Tr. 340).  On December 18, 2015, Courtney Zeune, Psy.D., concurred with Dr. Haskins' opinion.  (Tr. 352, 355–57).

### D.      Relevant Testimonial Evidence

Gonzalez testified at the ALJ hearing.  (Tr. 288–317).  She stated that she lived with her husband, who worked.  (Tr. 289).  She could drive.  (Tr. 289).  On the typical day, Gonzalez

woke up at 2:30 or 3:00 am, "pace[d] a little bit," did dishes, walked around, sat in a recliner, read, napped, cooked breakfast with her husband, used the internet to see what people were doing on social media, did laundry, and researched fibromyalgia. (Tr. 294). She had two friends, who visited her and talked to her on the phone. (Tr. 295). Gonzalez stated that showering and getting dressed in the morning exhausted her. (Tr. 303–04). When she went to the grocery store, she felt like she needed to leave quickly due to her pain and anxiety. (Tr. 307). Her husband helped her with lifting and reaching things on shelves when she grocery shopped. (Tr. 307–08). She could carry a gallon of milk with both hands, but she could not grip it with one hand. (Tr. 309). She had trouble opening water bottles and stirring things in a pot. (Tr. 312). Her husband cut vegetables for her, swept, and vacuumed because she could not do those things. (Tr. 314). When using the internet, Gonzalez positioned herself in a recliner, used a tablet computer, and positioned the tablet on her lap to keep the pressure off her hands. (Tr. 301–02).

Gonzalez testified that she last worked in June 2015, and that she had worked for a medical office as a front desk receptionist and in billing. (Tr. 290–91). She did "some lifting" of UPS parcels that "sometimes" weighed more than 10 pounds but never more than 20 pounds. (Tr. 291). She sat most of the workday. (Tr. 291). She also worked at the front desk for a psychological consultant's office, where she lifted less than 10 pounds at a time and sat most of the workday. (Tr. 292). She occasionally had to get up to greet and check in patients. (Tr. 292). She also worked as an office manager for a counseling center, where she did no lifting and sat most of the day. (Tr. 292–93). Gonzalez said that she quit her last job because she "just couldn't do it anymore." (Tr. 296, 313). She said her anxiety caused her to have to print out every email she received, and that she had trouble getting phone numbers from phone messages. (Tr. 296).

Gonzalez testified that her hands and wrists hurt all the time, she had bad discs and a pinched nerve in her neck, and her fibromyalgia caused pain in her lower back, buttocks, legs, and feet.  (Tr. 298).  Her physical pain made her anxiety worse and she was depressed.  (Tr. 298, 300).  She had crying spells once a week.  (Tr. 304).  If she stood for more than 10 or 15 minutes, her lower back and feet hurt.  (Tr. 309).  She could sit for 10 minutes before her hips and legs hurt, and she could walk for 30 to 45 minutes without any assistance.  (Tr. 310). Gonzalez said that her treatment for fibromyalgia did "not really" help.  (Tr. 297).  She said that she did not take "high pain medications," because she did not want to and had reactions to certain medications.  (Tr. 297).  She said her anxiety and depression medications helped. (Tr. 299–300, 305–06).  Her depression also improved when she spent time with her family. (Tr. 305).

Gail Klier, a vocational expert ("VE") also testified at the ALJ hearing.  (Tr. 317–22). The ALJ asked the VE what work a hypothetical individual with Gonzalez's age, education, and prior work could perform, if she could perform light work, except:

> This individual can frequently reach overhead bilaterally, frequently handle bilaterally.  This person can frequently climb ramps and stairs, never ladders, ropes, or scaffolds.  Can frequently stoop, kneel, crouch, . . . and only occasionally crawl.  This individual can work in an environment with no production rate pace requirements, and can tolerate frequent interaction with supervisors and coworkers, and only occasional interaction with the  public.  And this person can tolerate routine workplace changes.

(Tr. 318).  The VE testified that Gonzalez could perform her prior work as a billing clerk, which was sedentary work as performed and in the *Dictionary of Occupational Titles*.  (Tr. 319).  She could also work as a dining room attendant, cleaner housekeeper, and office helper.  (Tr. 319–20).  The ALJ asked what work would be available if the hypothetical were further restricted to sedentary work, and the VE testified that such an individual could work as a billing clerk, document specialist, addresser, and patcher.  (Tr. 320–21).  The VE testified that, if the

11

hypothetical individual would be off-task for more than 10% of the workday, all work would be precluded.  (Tr. 321–22).

Gonzalez's counsel asked the VE what work would be available for the individual in the ALJ's second hypothetical (sedentary work), if that individual were restricted to only occasional handling and fingering.  (Tr. 322).  The VE testified that no work would be available for such an individual.  (Tr. 322).

## IV.    The ALJ's Decision

The May 30, 2017, ALJ decision found that Gonzalez was not disabled and denied her application for disability insurance benefits.  (Tr. 255–71).  The ALJ determined that Gonzalez met the insured status requirements through December 31, 2019, and that she had not engaged in substantial gainful activity since June 26, 2015.  (Tr. 256).  The ALJ found that Gonzalez had the severe impairments of fibromyalgia, anxiety disorder, and affective disorder.  (Tr. 256).  The ALJ determined that Gonzalez had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 258).

The ALJ determined that Gonzalez had the RFC to perform light work, except that:

> The claimant can frequently reach overhead and handle bilaterally.  The claimant can climb ramps and stairs frequently.  The claimant can never climb ladders, ropes, or scaffolds.  The claimant can frequently stoop, kneel, and crouch.  The claimant can occasionally crawl.  The claimant can work in an environment without production rate pace requirements.  The claimant can tolerate frequent interaction with supervisors and coworkers.  The claimant can have occasional interaction with the public.  The claimant can tolerate routine work changes.

(Tr. 260).  In assessing Gonzalez's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 261).  Specifically, the ALJ noted that Gonzalez complained, *inter alia*, that she had limitations in social interaction, lifting, squatting, standing, sitting, stair climbing, kneeling, and walking.  (Tr. 262).

In assessing Gonzalez's mental functions, the ALJ found that the medical evidence did not support mental "limitations that would preclude [Gonzalez] from performing work within the above [RFC finding]."  (Tr. 265).  The ALJ noted that she "engage[d] in a relatively full complement of daily activities, . . . [she] sought little psychological treatment, . . . and all documented evaluations . . . indicated an ability to cooperate and relate in an appropriate manner."  (Tr. 265).  The ALJ stated that he gave "great weight" to the Dr. Haskins' and Dr. Zeune's opinions, stating:

> With regard to [Gonzalez's] mental impairment, the state agency's psychological consultant at the initial level, Kristen Haskins, Psy.D., noted that [Gonzalez] ha[d] the ability to . . . interact appropriately with others in the workplace that has expectation for occasional superficial interactions . . . .  Courtney Zeune, Psy.D., reached a similar conclusion.  I give great weight to the non-examining opinions of the state agency medical consultants . . . .  Nevertheless, the totality of the evidence does not reflect such severe psychologically related impairments to preclude the claimant from basic, unskilled work activities.

(Tr. 266).  The ALJ gave "partial weight" to Dr. El Sayegh's opinion, that Gonzalez had "mild limitations relating to other people, sustaining a routine without special supervision, responding appropriately to supervision, performing simple tasks," and "moderate limitations . . . behaving in an emotionally stable manner, and . . . responding appropriately to supervisions, co-workers customary work pressures . . . ."  (Tr. 267).  The ALJ also gave "partial weight" to Dr. DeCola's opinion, that Gonzalez "appear[ed] to have identified physical and mental health problems that would likely reduce her ability to respond well to co-workers and a supervisor."  (Tr. 267).

In assessing Gonzalez's physical functions, the ALJ found that Gonzalez could perform light work, because evidence in the record showed that she could lift and carry no more than 20 pounds, lift and carry up to 10 pounds frequently, and sit, stand, or walk up to 6 hours each in an 8-hour workday.  (Tr. 260).  The ALJ stated that he gave "great weight" to Dr. Torello's and Dr. Bolz's opinions – that Gonzalez could perform a full range of light work.  (Tr. 266).  The ALJ stated that he gave "limited weight" to physical therapist Diehl's opinion, because it was

"inconsistent with the medical record, which demonstrate[d] that [Gonzalez] was capable of performing light work." (Tr. 268). The ALJ noted that he considered Diehl's opinion only "with respect to severity and effect of function," because Diehl was not an acceptable medical source and her opinion alone could not document severe or disabling vocational limitations. (Tr. 268). Further, the ALJ specifically noted that Diehl opined that Gonzalez's hands caused the greatest physical exertion limitations, but "she was able to modify [her] positions to allow her" to complete tasks. (Tr. 268).

Based on the VE's testimony and Gonzalez's RFC, the ALJ found that Gonzalez was "capable of performing past relevant work as a billing specialist." (Tr. 268–70). The ALJ also found that Gonzalez could work as a dining room attendant, cleaner housekeeper, and office helper. (Tr. 270). In light of his findings, the ALJ determined that Gonzalez was not disabled from June 26, 2015, through the date of his decision and denied Gonzalez's application for disability insurance benefits. (Tr. 270–71).

## V.      Law & Analysis

### A.      Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. § 405(g) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we

14

are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."

15

*Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a).

### B.    Medical Opinions

Gonzalez argues that the ALJ failed to properly apply legal procedures and reach a conclusion supported by substantial evidence in weighing the medical opinion evidence.  ECF Doc. 16 at 4-8.  Gonzalez asserts that the ALJ did not adequately explain why he found that she could frequently interact with coworkers and supervisors, despite giving great weigh to

Dr. Haskins' and Dr. Zeune's opinions, which found that she could only occasionally and superficially interact with others. *Id.* at 5. Gonzalez also contends that the ALJ failed to adequately explain his reasons for giving little weight to physical therapist Diehl's opinion – that Gonzalez was limited to sedentary work – because he relied only on the circular reasoning that the medical record showed Gonzalez could perform light work to reject Diehl's opinion. *Id.* at 8. Further, Gonzalez asserts that the ALJ inaccurately characterized Diehl's FCE and failed to address her other opinions in the FCE, such as that Gonzalez could occasionally perform fine and gross motor tasks with her hands. *Id.* at 8.

The Commissioner responds that the ALJ did not err in weighing the medical opinion evidence. ECF Doc. 19 at 6-12. The Commissioner argues that, although the ALJ did not specifically state why he found Gonzalez could frequently interact with supervisors and coworkers, his discussion "provide[d] enough of a path to follow the reasoning behind his mental functional capacity finding." *Id.* at 9. Specifically, the Commissioner asserts that the ALJ adequately considered the state agency consultants' opinions regarding Gonzalez's capacity for interaction, found that the "totality of the evidence did not reflect such severe psychologically related impairments," and discussed and relied upon other opinion evidence indicating that Gonzalez had only mild social interaction limitations. *Id.* at 9-10. Further, the Commissioner argues that the ALJ adequately considered Diehl's opinion, and explained that it was due little weight because: (1) it was inconsistent other medical records and opinions indicating that Gonzalez could perform light work; and (2) Diehl was not an acceptable medical source. *Id.* at 11-12.

In her reply brief, Gonzalez reiterates her argument that the ALJ did not adequately explain why he did not adopt the interaction limitations in the state agency consultants' opinions despite giving those opinions great weight. ECF Doc. 20 at 1. She also asserts that the

Commissioner's argument – that the state agency consultants' physical capacity opinions supported rejecting Diehl's opinion – is an improper *post hoc* rationalization.  *Id.* at 2.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 61 Fed. Reg. at 34477.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a).  A person with an RFC to perform light work can lift no more than 20 pounds at a time, can frequently lift up to 10 pounds, and may perform work that involves "a good deal of walking or standing, or . . . sitting with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

In assessing a claimant's RFC, the ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 404.1527(c).  The ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506–07 (unpublished) (noting that two or three visits "often will not suffice for an ongoing treatment relationship" required for a physician to be a treating source.  On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, the ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the

record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. § 404.1527(c).  Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. § 404.1527(c)(2); *Gayheart*, 710 F.3d at 375.  The ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

A physical therapist is not an "acceptable medical source," and, thus, is not entitled to any "special deference."  *See* 20 C.F.R. § 404.1502(a) (defining "acceptable medical source"); *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (unpublished) (stating that opinions from non-acceptable medical sources are not entitled to any "special deference); *Perschka v. Comm'r of Soc. Sec.*, 411 F. App'x 781, 787 (6th Cir. 2010) (unpublished) (noting that the "Social Security regulations . . . do not include physical therapists in the list of acceptable medical sources who can provide evidence to establish an impairment").  Although a provider may not be characterized as an "acceptable medical source," her opinion is nonetheless "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 71 Fed. Reg. 45593, 45595 (Aug. 9, 2006) (noting that licensed clinical social workers, *inter alia*, have increasingly assumed a greater percentage of treatment and evaluation functions).[2]  In evaluating such evidence, the ALJ is directed to consider the following factors: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is

---

[2] The Commissioner rescinded SSR 06-3p for claims filed on or after March 27, 2017.  *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 Fed. Reg. 15263 (Mar. 27, 2017).  Because Waters filed her claim on November 25, 2014, SSR 06-3p applies to her claim.

with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  *Id.*  An ALJ is not required to articulate "good reasons" for rejecting an opinion from a non-acceptable medical source.  *Pruitt v. Comm'r of Soc. Sec.*, No. 1:16-cv-2927, 2018 U.S. Dist. LEXIS 49512 *44 (N.D. Ohio 2018)*; *but see* SSR 06-3p, 71 Fed. Reg. at 45596 ("[T]he adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent review to follow the adjudicator's reasoning.").

"Even [when] an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt [a medical source's] limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  However, the ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict in the opinion evidence and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).  The ALJ need not

20

incorporate his explanation into a single, tidy paragraph, so long as his discussion as a whole is sufficiently specific enough for a subsequent reviewer to understand his reasons for crediting one opinion over another. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89 ("There is no requirement of such tidy packaging, however; we read the ALJ's decision as a whole and with common sense."); *cf. Gayheart*, 710 F.3d at 376 (stating that an ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight.")

### 1. State Agency Consultants' Opinions

The ALJ did not fail to apply proper legal procedures in evaluating the state agency consultants' mental function opinions. *42 U.S.C. § 405(g)*; *Elam*, 348 F.3d at 125. Because the ALJ gave great weight to Dr. Haskins' and Dr. Zeune's opinions, he was required to explain the conflict between his RFC finding – that Gonzalez could frequently interact with coworkers and supervisors – and Dr. Haskins' and Dr. Zeune's opinions – that Gonzalez could only occasionally and superficially interact with others. *Reeves*, 618 F. App'x at 275; *Justice*, 515 F. App'x at 587; *Fleischer*, 774 F. Supp. 2d at 881; *Rogers*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44; (Tr. 260, 266). Although the ALJ did not package his explanation in a single, discrete paragraph, his discussion was sufficiently specific for a subsequent reviewer to understand that he rejected Dr. Haskins' and Dr. Zeune's interaction limitation because other evidence in the record did "not reflect such severe psychologically related impairments." *Buckhannon*, 368 F. App'x at 678–89; *Gayheart*, 710 F.3d at 376; (Tr. 266). Here, the ALJ dedicated significant portions of his RFC analysis to evaluating Gonzalez's capacity to interact with others, explicitly considering: (1) Dr. Haskins' and Dr. Zeune's opinions; (2) Dr. El Sayegh's treating source opinion that Gonzalez had only "mild limitations" in relating to others and responding appropriately to supervision; (3) Dr. DeCola's examining source

opinion that Gonzalez's "mental health problems . . . would likely reduce her ability to respond well to co-workers and a supervisor," and (4) "documented evaluations [that] indicated an ability to cooperate and relate in an appropriate manner."  (Tr. 265–67).  Thus, the ALJ applied proper legal procedures by adequately explaining his reasons for giving great weight Dr. Haskins' and Dr. Zeune's opinions, but rejecting their findings that Gonzalez was limited to occasional and superficial coworker and supervisor interaction.  *Gayheart*, 710 F.3d at 375–76; *Smith*, 482 F.3d at 876; 20 C.F.R. § 404.1527(c).  Moreover, substantial evidence supported the ALJ's RFC finding that Gonzalez could frequently interact with coworkers and supervisors, including: (1) Dr. El Sayegh's opinion that Gonzalez had only "mild limitations" in relating to others and responding appropriately to supervision; and (2) treatment notes indicating that Gonzalez was cooperative, pleasant, and able to communicate effectively.  (Tr. 637, 669, 708, 716, 730, 751, 757, 765, 769–73, 787, 794, 803, 813, 822, 831, 839, 849, 860, 864–73, 1044–45, 1050, 1114, 1246, 1325–27, 1403, 1637–38, 1643–44, 1682–83, 1731, 1747, 1794–95, 1876, 1859–60).  Accordingly, the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in weighing the state agency consultants' opinions.

### 2.    **Physical Therapist Diehl's Opinion**

The ALJ also applied proper legal procedures and reached a decision supported by substantial evidence in weighing physical therapist Diehl's opinion.  42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125.  Here, the ALJ complied with the regulations by stating that he gave Diehl's opinion little weight, because: (1) it was inconsistent with the medical record, which demonstrated that Gonzalez could perform light work; and (2) Diehl's opinion was only relevant to severity and effect on function, because she was not an acceptable medical source.  SSR 06-03p, 71 Fed. Reg. at 45595; *Pruitt*, No. 1:16-cv-2927, 2018 U.S. Dist. LEXIS 49512 *44; (Tr. 268).  Further, the ALJ did not mischaracterize Diehl's opinion by ignoring Diehl's opinions

about Gonzalez's limitations in using her hands, but specifically noted Diehl's opinion regarding Gonzalez's hand use limitations and rejected that opinion based on Gonzalez's ability to modify positions to complete tasks.  (Tr. 268).  Moreover, substantial evidence supported the ALJ's decision to reject Diehl's opinion, including: (1) Dr. Torello's and Dr. Bolz's opinions, that Gonzalez could perform a full range of light work; (2) Gonzalez's testimony that she was able to position her tablet computer to account for her difficulties in using her hands; and (3) Diehl's findings that Gonzalez could push 43 pounds, pull 36 pounds, lift 12 to 19 pounds, bilaterally carry 19 pounds, and frequently lift or carry 13 to 14 pounds.  20 C.F.R. § 404.1567(b); (Tr. 266, 301–02, 338–39, 342, 354–55, 358, 575–76).  Accordingly, the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence in weighing Diehl's opinion.

### C.       Disability Determination

Gonzalez argues that the ALJ should have found that she was disabled, based on the VE's testimony that she would not be able to work if she were limited to occasional handling and fingering.  ECF Doc. 16 at 8.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d) (noting that the medical-vocational guidelines do not direct a conclusion of disabled or not disabled when a claimant cannot perform the full range of a category of work).  A vocational expert's testimony in response to a hypothetical question is

23

substantial evidence when the question accurately portrays the claimant's RFC.  *See Howard, 276 F.3d at 238* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments'" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in finding that Gonzalez was not disabled at Step Five.  42 U.S.C. § 405(g); *Elam*, 348 F.3d at 125.  Because the ALJ rejected Diehl's opinions regarding Gonzalez's limitations in using her hands, the ALJ was not required to include them in his RFC finding.  *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 260, 268).  Further, because the ALJ's hypothetical question to the VE reflected the ALJ's RFC finding, the ALJ was permitted to rely on the VE's testimony – that Gonzalez could work as a billing specialist, dining room attendant, cleaner housekeeper, or office helper.  *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; (Tr. 260, 268–70, 318–20).  Thus, even if evidence in the record could have supported a different result, the ALJ finding that Gonzalez could perform work in the national economy and was not disabled was within the Commissioner's "zone of choice," because it was reasonably drawn from the record.  *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

24

**VII.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Gonzalez's application for DIB be AFFIRMED.

Dated: March 19, 2019

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).